Brown, Fry, Christian and Robertson, J.
dissented from the opinion and the judgment. And the following opinion (in which Fry and Christian, J. expressed their concurrence) was delivered by
*732 Robertson, J.
Ho question -which concerns the administration of the criminal laws of a state can be regarded as unimportant. Especially is it in cum-bent on those whose province it is finally to determine the true construction of the penal code, to pause and ponder well before they break down or weaken the barriers erected against oppression and prejudice. On this account perhaps, rather than on account, of its practical or intrinsic importance, the present case has received a more than ordinary share of attention. Finding myself, after the best consideration, constrained to dissent from the opinion of a majority of the court, it is but respectful to them, as well as due to myself to assign some of the reasons which have influenced my judgment.
The privilege of a jury de medietate has existed in England from an extremely remote antiquity. It is said, no medietas linguce was at the common law; and it seems certain that the courts had no power to award it: but in the old treatise entitled Trials per Pais (p. 210), we are told that “this trial, by the common laxo, was wont to be obtained of the king by his grant.” Be this as it may, it was allowed as early as the reign of Ethelred (in the 10th century) to Welshmen, who were then aliens: and to a Jew as early as the 9th of Edw. 1, (the year 1281.) It was expressly accorded (only however in civil cases) to alien merchants by the statute of the staple, 27 Edw. 3, stat. 2, eh. 8, (1353); indeed, if the parties were all aliens, a full jury of aliens was given: and by a statute passed the succeeding year, the jury de medietate was extended to all-aliens, and to “ all manner of inquests and proofs.” (28 Edw. 3, ch. 13, § 2.) And on this footing it continued until doubts of its existence were created by the general terms of the statute 2 Hen. 5, stat. 2, ch. 3, declaring the qualifications of jurors. To remove these doubts or remedy the inconvenience, the 8 Hen. *733 6, ch. 29, was passed, evincing the great solicitude of the English'people to preserve the privilege paired. In the same spirit, it is believed, the courts of England have expounded the statutes according it. They have held that subsequent statutes, no matter how generally expressed, fixing the qualifications of jurors, do not apply to juries de medietate: that in trials where medietas linguae is required, the alien may be aided de circumstantibus, (and this, though it seems, by the words of the act, no tales is granted in such cases,) because the statute was made for the speedy execution of justice, and should be expounded favourably to serve the intent of the makers. 2 Hawk. P. C. ch. 43, § 35; 21 Vin. Abr. 187; Jenk. 288, pl. 14; 10 Rep. 104, citing Julius Caesar’s Case. The tales, moreover, we are told in the quaint language of the author of Trials per Pais (p. 72, 74,) ought to be of the same quality as the guales; for u tales are words similitudinary: therefore, if the first jury be per medietatem linguae, so ought the tales to be.” Bor have I been able to find a solitary instance on record, of a refusal by the English courts to award the writ in question when prayed for in due time by an alien, since the statute of Edw. 3—though Blackstone says (3 Black. Comm. 361,) some question may now exist how far the statute 3 Geo. 2, ch. 25, hath undesignedly abridged this privilege in civil cases.
Turning to our own state, we find it much more difficult to ascertain the true history, origin or extent of the privilege in question. We have no printed reports of criminal cases of an earlier date than 1789, nor any printed report whatever, so far as I have discovered, of a decision on the particular subject.
It is doubted whether the privilege existed at all, either by law or usage, during our colonial history. It is doubted also whether it could be granted under the ordinance of 1776, adopting the common law of *734 England, and all acts of parliament prior to the 4th Q£ jameg «an(j which are of a general nature, not-local to that kingdom.”
p deem it unnecessary to give the reasons which incline me to the opinion that it was always demandable of right in Virginia, since that opinion has no influence on the particular question before us. That question must depend on the proper construction of laws, passed since the Revolution, and which I now proceed to consider.
The first instance we have been able to find of any direct legislation upon the subject, is in the act “establishing District Courts and for regulating the General Court,” passed in 1788; 12 Hen. Stat. at Large, p. 730. The 44th section is in these words: “Juries de medietate tinguen may be directed by the court to be summoned.” In 1792, this provision was transposed to the act “concerning grand juries, petit juries, and veniremen,” with a slight alteration in phraseology; Juries de medietate tinguen may be directed by the courts respectively.” l'Old Rev. Code, ch. 74, § 13. This last act preceded that repealing the British statutes, though both were passed at the same session. I note these circumstances to shew that the provision was probably intended to obviate the consequence which would have resulted to aliens, in respect to this privilege, by the repeal of the British statutes; and to shew that it was not casually or inadvertently introduced into our code at the session of 1792, but upon deliberate consideration. And it was again deliberately re-enacted at the revisal of 1819: see the act to reduce into one the several acts concerning grand juries and petit juries, 1 Rev. Code of 1819, ch. 75, § 13, p. 266.
The privilege therefore has existed of right or in the discretion of the several courts of criminaljurisdiction, undeniably, by express statutory provision, for upwards of fifty years.
*735 The instances in which it has been claimed (much to the honour of our state) have not been frequent. Several of the judges of this court, I understand, have awarded it in their respective circuits. Only one instance has fallen under my own personal observation, in which it was applied for; the trial of Lowther for murder, before the late Superior Court of Law for Henrico county. In that case, on the prisoner’s motion, Judge Brochenbrough quashed the venire facias and pannel, and awarded a venire facias de medietate linguae. The present case, and that of Brown, now before us on petitions for writs of error, are the .first, so far as my information extends, in which the jury de medietate was ever refused in a criminal case, when asked by an alien in proper time.
In the case of Bichards, the more immediate subject of consideration, the writ in point of fact, was actually directed, and a jury de medietate summoned. Of the aliens summoned, three only appeared, ene of whom was challenged by the prisoner for cause; and there being a defect of jurymen such as the precept required, the prisoner moved the court instanter, either to compel the attendance of the veniremen who had been summoned, or to order the sheriff to summon as many other aliens as would make up a jury de medietate. The court overruled his motion, notwithstanding the admission of the attorney for the commonwealth that there were other aliens in the county sufficient to complete the jury, and a jury was impanneled consisting of ten denizens and two aliens; the first, it is believed, of that description,; ever impanneled under such circumstances, either for the trial of a denizen or an alien.
If the prisoner was not entitled to a jury de medietate, it was clear error to put aliens of any number on the pannel: if he was, he was entitled to a full moiety of aliens, provided they could be had. 21 Yin. Abr. 188-, *736 pi. 5, Id. 189, pi. 1. Such, as I understand it, is the so are the precedents; and I am yet to see one to the contrary, if such exist in England or in Virginia. Ought we now to make this precedent?
It is- said the language of our statute differs from that of the English statute, and justifies a different course of proceeding: and the attorney-general contends, that under our act the privilege is in no case demandable of right, but the grant of it is discretionary with the courts. Such is not my opinion. It is true the terms used are, that juries de medietate may be directed. But where a statute directs a thing for the sake of justice or the public good, may is the same as shall. Salk. 609; 6 Bac. Abr. 379. Had the'-law used the term “must” or “shall,” it might have been construed as compulsory on the courts in all cases where aliens were parties, whether civilly or criminally, and whether they prayed for such juries or not. But the learned committee of revisors who first inserted the provision in the bill concerning juries, as well as the general assembly who made it the law, must be presumed to have known, that to the general rule giving the privilege in question, as well as to all others, there were or might be some exceptions. It was known, that in England the writ would never be issued unless prayed for; nor unless prayed for in the proper time, (although it has been allowed in England even after the return of a distringas, 21 Vin. Abr. 189, pl. 2, note, notwithstanding it was not prayed tor at the venire facias, as it was in this case,) nor where denizens and aliens were joint defendants. 21 Vin. Abr. 188, pl. 10. In all these cases, possibly in others, even the courts of England might refuse a jury de medietate, notwithstanding the peremptory terms of the statute of Edw. 3, which declares, that “ in all manner of inquests and proofs ” amongst aliens and denizens, one half of the inquest or proof “shall” be denizens, and the other *737 half of aliens, if so many; &c. But neither these nor similar exceptions abrogate the general rule, or render it, in my opinion, the less obligatory. Neither do they, or the terms of our statute under which their observance may well be justified, render it, as seems to be supposed, wholly discretionary or optional with the court, in all cases, to grant or withhold the privilege. The law, in my opinion, is imperative; and equally so in reference both to the general rule and the acknowledged exceptions. The court, in this viewr has no discretion to grant the writ in the excepted eases, nor to refuse it in others. In no case is the grant or denial ex gratia. In some cases the alien may have no right to claim it: but in all others the right to claim it does exist, and, in my opinion, not as a matter of favour, but ex debito justitiace, a right as absolute and as perfect as that to a jury composed of twelve men; and to this extent I wish to be understood, in expounding the statute as imperative.
It may be true, that in England this privilege may have been allowed anciently ex gratia, by special grant from the crown, (Trials per Pais, 210,) as Sergeant Hawkins supposes it may now, in cases of treason; 2 Hawk. P. O. ch. 43, § 37, p. 420. But our constitution, which forbids the exercise by the executive of any prerogative by virtue of any law, statute or custom of England, did not design that the kingly prerogative of dispensing favours to prisoners ex mera gratia, should be transferred to the judiciary. “To leave it in the breast of the judge to relax or supersede general restrictions and rules whenever he shall think particular cases not within the reason of them,” has been always thought of dangerous tendency. 4 Burn’s Eccles. Law, 88. Eearne on Bemainders, 429. An arbitrary and uncontrolled discretion, even in a judge, may be well defined the law of tyrants. “ It is always unknown: it is different in different men: it is casual, and’ de *738 pends upon constitution, temper and passion. In the peg^ ^ jg 0ftentimes caprice: in the worst, it is every vice, folly and passion to which human nature is liaThe consequences of such a discretion would be peculiarly mischievous under our judicial system, administered as it is by upwards of twenty judges, each in his particular circuit. The law of one circuit might differ from that in another, and no one indeed would be able to say what would be the law in any case, before it should be pronounced; depending, as it ivould, upon the circumstances of the case, or the humour of the judge; and no means would exist, in this or any other court, of remedying the uncertainty or enforcing uniformity, where the will oí the judge alone was the law of the case.
But it cannot be seriously urged that the authority to be exercised by the courts, in this or in any case, is discretionary in the sense in which that authority might have been, or may now be, exercised by the king of England. It is not a royal prerogative which they possess, but at‘most a judicial discretion, governed by well settled principles, and liable to be controlled by the proper appellate tribunals. Thus viewing it, let us enquire what are the grounds upon which the Circuit Court refused to impannel a jury de medietate in the present case.
The fact of alienage was proved to the satisfaction of the court. The writ was applied for in proper time; was actually awarded (without objection, as far as appears, by the court or the prosecution), and was duly executed. A part of the aliens summoned appeared, and two were impanneled. The prisoner then applied for suppletory process, to render the privilege to which the court had deemed him entitled, effectual. Such process, in either of the modes in which he was willing to take it, was authorized by law. But the court refused its aid; thus, in effect, suddenly and *739 ■without the suggestion of any reason whatever, retracting the grant, by refusing to make it effectual, ■though the means were admitted _ to be within its reach.
It is said, we are bound nevertheless to presume that this refusal.of the court to carry its own judg-’ ament and precept into effect, was upon good grounds.
The general proposition, that the decisions of courts •of competent jurisdiction are to be held well founded, will be readily admitted. But this doctrine has no .application where error in point of law in the judgment of an inferior court appears to an appellate tribunal. ÍTor, in criminal cases at least, can any matters of fact be inferred by argument, as constituting the grounds of such judgment. In the present case, for my own part, looking only to the record, I am unable to conjecture, and therefore cannot presume, any ■sufficient reason whatever for such refusal. The case is shewn to be one coming under none of the exceptions already stated. The proof was complete that the prisoner was an alien; and he prayed for the precept in due time. The grant of the precept itself implies a concession of his title to have it; and the commonwealth’s attorney admitted a sufficiency of such jurors as would satisfy its exigency. What ground is there for presumption, where there is nothing to shew that any additional fact appeared, or that any new evidence was offered? Prima facie at least, it was a case for a writ de medieiate. The court must so have considered it. Is it not incumbent then on the prosecution, to shew the grounds upon which, after it was actually awarded, its due enforcement was refused? If it was discreet in the court in the first instance (as .1 conceive it most clearly .was) to award the writ, it cannot well be that it was also discreet to render it nugatory. To give on due consideration, and take .away without suggesting a reason, is not indiscretion, *740 but caprice. The right to the process being conceded',. right to all means necessary and proper to give it full effect, and vindicate the authority of the court, -\yoyiq Seem to follow of course, on general reasoning. But the principle rests upon more solid grounds. The settled doctrines of the law establish its correctness in-reference to the particular question' before us, and; shew that in all cases where a tales becomes necessary to supply a deficiency of the principal pannel summoned on a writ de medietate, the tales- must be of such as are deficient, denizens if denizens be wanting, and aliens if there be a defect of aliens;' and that this is so, even where the tales are taken de dreumstantibus 10 Rep. 104. It is error, I apprehend, if the tales- does-not- pursue the venire facias. Trials; per Pais 74, 214. “If the venire facias be per medietatem linguae, the tales-ought to be per medieiam linguae.” Id. 72. And it is-said, “if eight indígenos and four alienigenee be impanneled, it is ill, because it is not per medietatem.” 21 Yin.. Abr. 188, pi. 5. (This must be understood, provided' a sufficiency can be found to complete the jury according to law.) Here the jury appears to be composed of ten denizens, and two aliens o-n-ly, although a sufficiency of aliens could have been had. If it be said, that the court, notwithstanding it had directed a jury; de medietate, might subsequently, and. without assigning any reason, retract or disappoint the grant, still-' this does not cure the error; for, admitting this, the-jury in such "case must be altogether of denizens. If the case then rests upon that ground, the court, retracting-the privilege, or refusing- to carry it into effect, could-not lawfully subject the prisoner to - be tried by any-other jury than one composed wholly of good and lawful-freeholders. There can be no lawful trial, except by-such a jury, or a jury composed, at the instance of am alien, the one half of good and lawful freeholders, and the other of aliens, if to be had.. The jury in the pre *741 ■sent cáse was neither a jury under the special provision for juries de medietate, nor under the ancient law, but constituted in a manner which, under the cireum.stances; was unauthorized by and unknown to the law •of England, or that of our own state.
If, upon the facts, so far as they are disclosed in the record, the prisoner was not entitled to a jury de medietate, I can imagine no state of facts sufficient to give him such a title. In conferring upon our courts the ■power to bestow a privilege, originating in England, and, until adopted by the American states, probably exising in no other country, it seems reasonable to suppose (there being no definite bounds prescribed by our own law) that the mode and measure of its enjoyment were intended to be regulated by the practice and principles regulating them in England. This would be so, I think, upon the reason of the thing, independent of the consideration that our language, laws and customs are, in the main, either identical with or similar to those of Great Britain; that the decisions of the English courts are, where applicable, habitually referred to and adopted by our own; and that the very process by Avhich this particular privilege is enforced, as almost all the process we use, is that framed in England, and preserved by the saving clause of our act repealing the British statutes. Looking then to England, nothing further was ever required to entitle an alien to a jury de medietate, so far as I' have seen, than that he should allege or prove his alienage, and pray tor the writ in proper time. The same rule, I infer, prevails in New Yoi’k. In the case of The People v. M’Lean, 2 Johns. Rep. 381, the only question apparently raised Avas, whether the jury de medietate might be summoned instanter. Although it would seem from the statute cited in the case (Laws of New York, vol. 1, p. 377-9,) that the right to such a,jury rested upon implication, rather than any ex *742 press provision, the right does not seem to have been nothing more appears than that the prisoner “ suggested his alienism, which was admitted.’*
It may be thought, that the application being to the discretion of the court, facts should be proved tending to shew that a prejudice existed on the part of the-, citizens against those of the nation to which the prisoner belonged. But in the first place, if any such-general prejudice exist in the circuit where he is arraigned, he has a right to a change of venue, wholly independent of the provision relative to juries de medietate: and in the next place, if the prejudice be national, and such as to justify an application for a jury de medietaie, the judge himself might not escape the-contagion, and thus the privilege would be most apt. to be withheld when it was most needed.
I forbear to go into the question of policy discussed at the bar. Surely, however, it is a mistake to sup- * pose that it was against the policy of Great Britain,, and much more that it was against that of the colonies,, to encourage the settlement of foreigners. The anxiety of our own state, on the contrary, to afford such) encouragement, is strongly expressed in the statutes-of naturalization, one of which passed as-early as 1671; see 2 Hen. Stat. at Large, p. 289, 464.. The settlements of the French Protestant refugees in. this state- and in the Carolinas, of the Swedes and Hutch in New York, &c., all go to disprove the suggestion, alluded to, that the colonial policy was adverse t©> the introduction of foreigners. Four thousand Germans are said to have been imported into Pennsylvania in 1750. Indeed, as it has been strongly expressed, “'the- colonies now forming the United States may be considered as Europe transplanted.” I hav.e not fully examined what states grant or refuse juries de medietaie. The privilege is not allowed in Horth Carolina; State v.. *743 Antonio, 4 Hawks’s Rep. 200. In South Carolina it is granted by express statute passed in 1783, nearly the words of the 28 Edw. 3. In Maryland and Pennsylvania it is also said to exist; and in the last was judicially awarded on the ground of usage, shewn by rather loose evidence of a single instance, although no law of the 'state directly recognized it, and although the Chief Justice (M’Kean) was of opinion that the reasons which gave rise to the statute of Edw. 3, did not apply to the then government of Pennsylvania. 1 Dall. 73.
But the policy or impolicy of the law is a question addressing itself to a different department of the government. It is enough for us that we find it on the statute book: and I deem it my duty, until the legislature shall think proper to repeal it, to give it a candid exposition and full effect.
I will add a single remark. It may be supposed that the privilege of a jury de medietate linguce ought not to be accorded to those who speak the same language as ourselves. But the statute which originally conferred it in England is not per medietatem linguce, but by the moiety of aliens; and so runs the writ of venirefaeias. 21 Vin. Abr. 189 (in margin). Bastall’s Entries 265. Since the era of our independence, the English and ourselves have stood towards each other in the relation of foreigners: and I cannot doubt that every American citizen, if impleaded in the courts of England, may now demand this privilege, which, (as already said,) before it was adopted by the states of America, or some of them, into their codes, it was the boast of England' was indulged to strangers in no other country in the world.
The result of my best reflections is a conviction that the Circuit Superior Court of Chesterfield erred in overruling the motion mentioned in the bill of excep *744 tions, and in refusing to give to the petitioner the full benefit of the writ de medietate lingua, authorized by law, and issued by its own direction: and consequently that the judgment ought to be reversed, and a new trial awarded.
Writ oe error denied.